RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NATHANIEL PEMBROOK (16-1650); SHAEED CALHOUN (16-1706); DAVID BRILEY (16-1707); ORLANDO JOHNSON (16-1708),

*Defendants-Appellants.*

Nos. 16-1650/1706/1707/1708

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cr-20525-1—Laurie J. Michelson, District Judge.

Argued: July 27, 2017

Decided and Filed: November 15, 2017[*]

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Benton C. Martin, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant in 16-1650. Harold Gurewitz, Detroit, Michigan, for Appellant in 16-1706. Martin J. Beres, Clinton Township, Michigan, for Appellant in 16-1707. Gary W. Crim, Dayton, Ohio, for Appellant in 16-1708. Christopher Graveline, UNITED STATES ATTORNEYS OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Benton C. Martin, FEDERAL DEFENDER OFFICE, Detroit, Michigan, for Appellant in 16-1650. Harold Gurewitz, Detroit, Michigan, for Appellant in 16-1706. Martin J. Beres, Clinton Township, Michigan, for Appellant in 16-1707. Gary W. Crim, Dayton, Ohio, for Appellant in 16-1708. Daniel L. Lemisch, Shane Cralle, UNITED STATES ATTORNEYS OFFICE, Detroit, Michigan, for Appellee.

---

[*]This decision was originally filed as an unpublished opinion on November 15, 2017. The court has now designated the opinion for publication.

———————

**OPINION**

———————

ALICE M. BATCHELDER, Circuit Judge. A federal jury convicted four co-defendants of robbery, conspiracy, and firearms charges stemming from two jewelry store robberies in Michigan on April 22, 2014, and the district court imposed lengthy prison sentences. The defendant/appellants—Nathaniel Pembrook, Shaeed Calhoun, David Briley, and Orlando Johnson—are African-American males, between the ages of 36 and 47, from Philadelphia, Pennsylvania. The first robbery was at 12:30 p.m. at Medawar Fine Jewelry in Plainfield Township, Michigan, a suburb of Grand Rapids. The second was at 5:15 p.m. at Tapper's Diamonds & Fine Jewelry in West Bloomfield Township, a suburb of Detroit. Both robberies involved guns and force. The government prosecuted the defendants to conviction on five counts: Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); use of a firearm in furtherance of the robbery, § 924(c)(1)(A); conspiracy to commit robbery, § 1951(a); use of a firearm in furtherance of the conspiracy, §§ 924(c)(1)(A) & (C)(i); and being a felon in possession of a firearm, §§ 922(g)(1) and 924(a)(1)(D)(2). We AFFIRM the convictions and sentences.

**I.**

FBI Agent Brian Max began his investigation of two similar Michigan jewelry-store robberies—separated by a drive of five hours and 150 miles—with a "tower dump" for the cell-phone towers near the two stores.[1] A "tower dump" is a chronological list of every phone number that used the tower for any purpose (voice call, text, internet connection, etc.) regardless of provider (e.g., Verizon, AT&T). Agent Max found that a phone number ending "1434"— assigned to a recently activated, prepaid cell phone with no name on the account—had used a tower or towers near each of the robberies at times corresponding to those robberies.

———————

[1]AUSA Kevin Mulcahy applied to the district court for orders compelling the "tower dump" of the cell-tower records, pursuant to the Stored Communications Act, 18 U.S.C. § 2703(d). All told, there were four applications and court orders. *See United States v. Pembrook*, 119 F. Supp. 3d 577, 580-83 (E.D. Mich. 2015).

Agent Max then obtained the "call detail records" (a list of all calls to and from that number, with dates, times, and tower locations) for the #1434-phone and tracked its path from Philadelphia (April 21, 2014) to Milwaukee; to New Buffalo, Michigan, for an overnight stay; to Plainfield Township, near the Medawar Jewelry store, 40 minutes before the first robbery (about 11:50 a.m.); to West Bloomfield Township, near the Tapper's Jewelry store, 15 minutes before the second robbery (5:00 p.m.); then back to Philadelphia the next day (April 23, 2014). Plainfield Township is less than two hours' drive north of New Buffalo; West Bloomfield Township, near Detroit, is less than three hours' drive from Plainfield Township.

Agent Max discovered three more phone numbers (ending 0033, 7819, and 1574) that followed the same pattern.[2] These four numbers had also contacted each other repeatedly during the trip, including, for example, dozens of times in the hour before the Medawar robbery. Of particular interest, a call from the #0033-phone to Enterprise car rental made a record of "Shaheed" Calhoun's renting a white Volkswagen Passat from a location at the Philadelphia train station on April 11 and returning it there on April 23 after driving it 3,463 miles. Calhoun had provided Enterprise[3] his Pennsylvania driver's license and paid with his credit card.

In addition to Agent Max's cell-tower and phone-records investigation, the FBI also had witness statements and surveillance videos from the robberies. At 12:30 p.m. on April 22, 2014, four men rushed into the Medawar Jewelry store,[4] one suspiciously carrying a large bag. Another had a hammer and began striking the glass jewelry cases (which did not break) while a third ordered an employee at gunpoint to open a safe. There were no customers in the store. The other employees, quickly recognizing the robbery, hid in the break room with the lights out, watching on closed-circuit video while the owner retrieved his own handguns. When the owner

---

[2]Each phone was a recently activated, prepaid cell phone with no name on the account that traveled from Philadelphia to Milwaukee on April 21, then overnight in New Buffalo, to locations near Medawar Jewelry at the time of the first robbery and Tapper's at the time of the second, and then back to Philadelphia on April 23.

[3]The vehicle was actually rented from Alamo Rent A Car, which is a subsidiary of Enterprise.

[4]Medawar Jewelry is located near Grand Rapids, in the Western District of Michigan. Because the U.S. District Court for the Eastern District of Michigan was not the proper venue for the adjudication of this robbery, the government did not charge the defendants with the Medawar robbery as a "robbery"; instead, the government charged the defendants with the Tapper's robbery (for which venue was proper) and included the Medawar robbery as part of a conspiracy to rob both.

yelled for the robbers to leave because he was armed, one robber[5]—armed with a handgun—instead pursued him. When that robber entered the break room, the owner shot at him, hitting him in the arm. At that, the robbers fled, one dripping blood from the gunshot wound. They were gone by the time police responded to the 911 call, but witnesses described a black, new model Chrysler Town & Country minivan. Police tracked blood drops to a location behind the store and exterior security videos had recorded the minivan parked there for an hour before the robbery with two of the robbers milling about nearby. No employee was injured in the robbery nor was anything of significant value stolen.[6] The loss was $2,252 in damage to the store. None of the victims was able to identify any of the robbers, either immediately or later at trial.

At 5:15 p.m. that same day, three men wearing masks and gloves entered the Tapper's Jewelry store[7] near Detroit, and ordered the employees and customers down on the ground. The first robber had a handgun and forced the security guard to the ground while the other two ordered an employee to open the case of Rolex watches. One robber held a bag while the other filled it with watches. This robbery lasted two minutes. An employee had tripped a silent alarm, but the robbers were gone before the police arrived. Exterior surveillance video, beginning an hour before the robbery, recorded the simultaneous arrival of the black Chrysler minivan and a white Volkswagen Passat. One man got out of the minivan; two exited the Passat. They separately went into a nearby shopping mall and returned without ever acknowledging each other, but upon their return, the man from the van got into the Passat and the two from the Passat got into the van. The first man moved the Passat to park it facing the Tapper's entrance. The van moved behind the store and three men wearing hoodies and gloves got out. Moments later, the same three ran back to the van with two bags and drove off. No one was injured during the

---

[5]Police ultimately determined this was Pembrook, based on DNA testing and ballistic evidence.

[6]Apparently certain personal documents, belonging to employees, were removed from the safe and taken.

[7]Agent Max testified that, based on his review of the surveillance videos, he did not believe that Pembrook was one of the three men who entered Tapper's.

robbery. The robbers made off with 123 Rolex watches, worth $853,957.[8] None of the victims was able to identify any of the robbers, either immediately or later at trial.

Further investigation led to a security video from a Comfort Inn in New Buffalo on April 21, the day before the robberies, which had recorded the simultaneous arrival of the Passat and the minivan at about 10:30 p.m. The driver of the Passat rented three rooms,[9] the cars pulled around to park, and six men got out of the two cars and shared the three rooms. A few minutes after arriving, three men took the Passat and then the minivan across the street for gas at a Shell station, as recorded on the Shell station's surveillance video. The Comfort Inn video also recorded four men leaving the motel the next morning at about 9:00 a.m., and those men were recognizable in the jewelry stores' videos as the men in the hotel videos.[10]

The cell-tower records had also placed the four suspected cell phones near this New Buffalo location and the call-detail records helped put names to three of the numbers: Calhoun to #0033 based on the aforementioned call to Enterprise as well as calls to his mother and girlfriend; Johnson to #1434 based on calls to his girlfriend (over 100 calls); and Briley to #7819 based on calls to his ex-wife, current girlfriend, daughter, and mother. The Shell station attendant, Sue Graff, later picked Calhoun and Briley from a police photo array. Johnson had given the #1434-phone to a friend in Philadelphia, who gave it to the FBI when questioned and who also identified Johnson in the videos from the Shell station and Tapper's. Briley was most evident in the videos from both the hotel and Tapper's because of a distinctive outfit.

Meanwhile, the blood drops at Medawar Jewelry produced Pembrook's name from the DNA database. Police tracked him to a Philadelphia hospital at which he had arrived at 4:00 a.m. on April 23 for removal of the bullet from his arm. He left a day or so later, but had called Briley from the phone in his hospital room before leaving. Ballistic tests matched the removed bullet to the store owner's gun. Philadelphia police arrested Pembrook and sent him

---

[8]This value was used in the Presentence Reports. The parties have elsewhere asserted that 137 watches were stolen, at a value of $1.2 to 1.3 million. The actual amount is not in dispute in this appeal.

[9]The man used the name "Robert Packard" and a Chicago address, but did not give formal identification.

[10]The other two suspects in the hotel surveillance videos were not identified, indicted, or prosecuted.

back to Detroit where he declined to cooperate and instead—using another inmate's phone passcode—called his girlfriend with a covert warning to the other robbers that the police were onto them.

Police eventually arrested the other three suspects and sent them to Detroit for prosecution. When the police arrested Calhoun, he had in his wallet the credit card and driver's license used to rent the Passat. When the police arrested Briley, his cell phone had a picture of him wearing the same outfit he was wearing in the Shell station surveillance video.

Facing robbery, conspiracy, and firearms charges, the defendants filed several pre-trial motions, including one to dismiss the second § 924(c) count as duplicative, one to suppress the cell-tower records or exclude testimony about it, and one to suppress the Shell station attendant's photo-array identifications. The district court denied the motions. *See* R. 75 and 85 (§ 924(c) as duplicative); *United States v. Pembrook*, 119 F. Supp. 3d 577 (E.D. Mich. 2015) (cell tower data and testimony); *United States v. Pembrook*, 2015 WL 6328186 (E.D. Mich. Oct. 21, 2015) (photo array). The case proceeded to a jury trial, which lasted 16 days. At trial, amongst other witnesses, FBI Agent Christopher Hess testified as an expert on cell-tower site information and Agent Max testified as a lay witness, not an expert. Also, mid-trial, the government unexpectedly called a jailhouse informant named James Jenkins to testify about his conversations with Pembrook. This prompted Pembrook to demand all of Jenkins's prison records, and the other defendants to move to sever the trial. The district court denied the motions.

The jury convicted all four defendants on all counts and the district court sentenced each of the four to 33 years in prison—one year each for the robbery, conspiracy, and felon-in-possession counts, to run concurrently, and 32 years for the two § 924(c) convictions (seven for the first and a mandatory 25 for the second, to run consecutively). All four defendants appeal.

## II.

### A.

The defendants claim that the pretrial photo-array identification was unduly suggestive. We review "the denial of a motion to suppress identification evidence for clear error."

*United States v. Washington*, 714 F.3d 962, 966 (6th Cir. 2013). "The burden rests on the defendant[s] to demonstrate that the pretrial identification procedure was impermissibly suggestive." *Id*. (quotation marks omitted). "If the defendant[s] meet[] this burden, then the court must determine, in light of all of the circumstances, whether the unfair suggestiveness was conducive to a very substantial likelihood of irreparable misidentification[s]." *Id*. (marks omitted).

Calhoun and Briley claim that the district court erred by denying their motion to suppress Shell station attendant Sue Graff's identification of them from the photo arrays and argue that the photo arrays were unduly suggestive, her testimony about her memory was equivocal, and her recollection came only from watching the surveillance videos later. For his part, Calhoun says that because there was no memorable event at the Shell station that would have caused Graff to remember the defendants, she identified them only from the video, not her recollection.

Briley's theory is more nuanced.[11] He begins with the premise that Graff's identification was unreliable because: (1) she initially claimed the video was too "grainy" and she did not have her proper eyeglasses; (2) she made no written statement, but just initialed her choice on the photo array (for Briley, number 4 of 6); (3) she told police her recollection was based on Briley's washed out skin and lips—"like Michael Jackson"—but omitted Briley's "most remarkable feature—that Briley had a beard with no mustache"; (4) at trial, she identified the wrong person on the photo-array (number 1 instead of 4) until the prosecutor directed her to her initials by Briley's photo (number 4), which changed her mind; and (5) the prosecutor did not ask her to identify Briley (or Calhoun) at trial, but relied solely on the photo array(s).[12]

Briley also accuses the police of coaching Graff with the video and withholding this from discovery, based on his interpretation of Graff's testimony: that she had seen the video before the

---

[11]Briley's theory in the district court had been that the photo array was unduly suggestive because the other people pictured did not look like him. The court disagreed as a factual matter. *Pembrook*, 2015 WL 6328186 at *3.

[12]Briley's attorney makes much of these last two items in his Reply Brief (i.e., that Graff initially identified the wrong photo and the prosecutor did not have her identify Briley at trial) but these things would actually appear to help Briley's defense inasmuch as the jury saw her misidentification, and we see nothing that prevented Briley's counsel during cross examination from emphasizing this error and exploring this perceived inability to identify Briley at trial, or from challenging her to identify Briley in court even though the prosecutor had not.

photo-array identification but could not have seen it at the Shell station because it was locked in the manager's office beyond her access, so "someone" from the government must have shown it to her, though she could not recall who.[13] The police investigator denied this. Proceeding on this theory that some unknown police officer surreptitiously showed the surveillance video to Graff and coached her to identify Briley (and Calhoun) in the photo array, Briley contends that the inquiry was improperly suggestive, that Graff's identification was unreliable and "implicates concerns related to cross-racial identification," and that the district court erred by refusing to suppress Graff's testimony. Moreover, Briley contends that the government's failure to disclose this supposed meeting and the officer involved violated *Brady v. Maryland*, 473 U.S. 83 (1963).

Because this claim rests on Graff's cross-examination testimony, in which she allegedly revealed this (secret and improper) meeting with an unknown police officer, who used the surveillance video to coach her to identify Briley and Calhoun, that testimony bears quoting:

Q.     Did you, on occasion, look at those videos just to see what was on them?

A.     No, I'm not allowed to go back in the manager's office. I have no access to that, she [the Shell station manager] keeps that under lock and key.

Q.     Before any officer traveled down to Grand Rapids or some place out of town to look at these tapes, did you see them?

A.     Did I see them when?

Q.     With the manager of the store, did you go into his [actually her] office and look at them for that night?

A.     I don't know who I looked [at] them with. It wasn't that night though.

Q.     Okay. Well, it was some time before the officer came [with the photo array], wasn't it? You're shaking your head.

A.     I do believe so, yes, but I don't think it was with the manager.

Q.     How much time did you spend looking at them then?

A.     I really couldn't tell you a time.

Q.     You had some idea when you looked at them, though, about what time it was that the officers were interested?

---

[13] All defendants and attorneys knew that Graff had viewed the surveillance video prior to her photo-array identification, as it was openly discussed at the July 21, 2015, hearing on Calhoun's motion to suppress that identification. The "new" aspect to this was the accusation that the police had shown it to her.

A.     Right, but then it refreshed my memory when I seen them people. I gave them a description because our screen was grainy.

Q.     Okay. So, before the officers came, I think that what you said, if I'm not correct, please let me know, that you looked at the tapes with someone, right?

A.     Yes.

Q.     Did you do that more than once?

A.     I couldn't tell you. I couldn't remember on that one.

Q.     Okay. And looking at them gave you the opportunity to see what was on those tapes, isn't that right?

A.     Yes.

Q.     So, that when it came some later point in time, an officer came with photos [i.e., the photo array] that you've seen here this morning, right?

A.     Right.

Q.     And before those individual photos, you had seen these tapes?

A.     It was days prior to that.

Q.     Right. And what you were thinking about in your head was as best as you could remember and all these things that included what you could remember about working back in April, that was one thing in your memory, right?

A.     Um-hum.

Q.     And another thing that was in your memory is what you had seen looking at those tapes, right?

A.     Yes.

Q.     And so the officer then asked you to look at some photos that you've said here today are the ones that were shown to you; isn't that right?

A.     Correct.

Q.     And then when you went through this process of picking out someone, what you were doing was basing your conclusion, what you thought in response to his question, about everything that was in your memory, right?

A.     Yes.

Detective Justin DeBoode was the lead investigator for this New Buffalo aspect of the investigation and, as such, reviewed the Shell station surveillance video with the station manager, questioned Graff with the photo array, and testified as the only witness at the pretrial

hearing on the defendants' motion to suppress that photo-array identification. The Shell video recorded the suspects on April 21 but the police did not learn of the video until May 28 and DeBoode did not speak with Graff until June 3. DeBoode testified that when he first spoke with Graff on June 3, which was by telephone, she had already watched the video—he reiterated this four times during his testimony—and he assumed that the Shell station manager or another employee had shown it to her. According to DeBoode, he met with Graff to view the photo array on June 23, almost three weeks later. He testified that neither he nor anyone else from law enforcement watched the video with Graff or ever advised her to watch it herself.

In Briley's pre-trial motion to suppress Graff's testimony as improperly relying on the surveillance video rather than her own recollection, the district court explained:

> Briley argued that because Graff reviewed the security camera footage before viewing the lineup, her identification was not based on her 'honest recollection' of the suspect, but rather, on the image portrayed in the security video. But DeBoode testified that neither he nor any other law enforcement agent instructed Graff to review the security camera footage before viewing the photo lineup. Thus, this is not an argument that the 'procedure itself' [i.e., the actions taken by the police] rendered the lineup unduly suggestive, but rather that Graff herself took certain actions that made her more likely to pick a suspect resembling the one pictured on the security video. This is certainly relevant for purposes of cross-examination, but it does not bar the admissibility of the identification. DeBoode further testified that the hat and clothing worn by the subject on the video is different from that being worn by Briley in the photo array, which further minimizes the risk that Graf[f] selected Briley merely because she reviewed the video and not based on her independent recollection.

*Pembrook*, 2015 WL 6328186 at *4 (citation omitted). This reflects that the district court believed Detective DeBoode's testimony that police did not view the surveillance video with Graff, a finding of fact regarding witness credibility to which we owe great deference on appeal.

As for Briley's *Brady* claim, the record contains no evidence that any government agent showed the surveillance video to Graff, much less coached her, and the government is not obliged to produce evidence that it does not have or that does not exist. *See United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."); *United States v. Edwards*, 442 F.3d 258, 266 (5th Cir. 2006) ("The prosecution has no duty to turn over

to the defense evidence that does not exist." (editorial marks omitted)); *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980) ("*Brady []* does not require the government to create exculpatory material that does not exist." (citation omitted)).

The district court properly denied this motion.

**B.**

The defendants appeal the denial of a pretrial motion to suppress the cell-tower location evidence. "In reviewing a ruling on a motion to suppress, we will uphold a district court's factual findings unless they are clearly erroneous, but will conduct a de novo review of a district court's legal determinations." *United States v. Dunning*, 857 F.3d 342, 346 (6th Cir. 2017).

Prior to trial, the defendants moved to suppress the cell-tower location information that Agent Max had obtained and used in the investigation, arguing that they had a legitimate expectation of privacy in that information under the Fourth Amendment such that its collection required probable cause or a warrant. Agent Max had no warrant, but instead used the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* In short:

> A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) . . . when the governmental entity . . . obtains a court order for such disclosure under subsection (d) of this section[.]

18 U.S.C. § 2703(c)(1)(B). Under subsection (d), such a court order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." *Id.* at § 2703(d). There is no dispute that "this statutory standard is less than the probable cause standard for a search warrant." *United States v. Davis*, 785 F.3d 498, 505 (11th Cir. 2015).

The district court denied the defendants' motion to suppress and held that, even if mistaken, the government had "an objectively reasonable good-faith belief" that no warrant was required. *Pembrook*, 119 F. Supp. 3d at 595-96. "[N]o Supreme Court authority established by

mid-2014 that obtaining cell-site data—even data that might reveal [the defendants'] daily travel over a six-week period or disclose [their] presence in a private place—was a search within the meaning of the Fourth Amendment," *id.* at 591; nor did any Sixth Circuit case establish such precedent, *id.* at 592-93; nor was the out-of-Circuit precedent compelling (or consistent), *id.* at 593-95. The district court concluded that, "[a]lthough it may ultimately become settled [law] that long-term tracking via cell phones . . . requires a warrant supported by probable cause, that law was not established at the time the Government sought and obtained the cell-site data at issue in this case. Deterrence, therefore, will not be forwarded by suppression." *Id.* at 599. We agree and find no constitutional reason to suppress the cell-tower location evidence.[14]

Calhoun also argued for suppression on the basis that Agent Max had provided the court an insufficient factual basis, which failed to satisfy the "reasonable grounds" requirement of the Stored Communications Act, 18 U.S.C. § 2703(d). But the district court explained that even if that accusation were true (without conceding that it was), because the Act's remedy provision, § 2707, does not provide for suppression as a remedy, the court was not authorized to suppress the cell-tower location information on such a theory. *Pembrook*, 119 F. Supp. 3d at 585.

In the initial application for the "tower dump," the AUSA (on behalf of Agent Max) briefly informed the magistrate judge about the particulars of the two robberies—the severity, the violence, and their similarities, such as that the surveillance video from the two stores supported the suspicion that the same robbers committed both—and concluded that he "believe[d] that cell tower information in the two locations may reveal a common [cell phone] number that was active at each location around the time of the crime [and] identification of this number w[ould] aid in identifying potential suspects involved in the robberies." Calhoun's primary complaint is that "[t]he application provided no facts to establish cause to believe any cell phone was used." That is a specious claim.

---

[14]Since the district court ruled, we (temporarily, it turns out) held that cell-tower location information is not protected. *United States v. Carpenter*, 819 F.3d 880, 890 (6th Cir. 2016) ("[W]e hold that the government's collection of business records containing cell-site data was not a search under the Fourth Amendment."). But the Supreme Court granted certiorari in *Carpenter*, No. 16-402, 2017 WL 2407484 (June 5, 2017), which vacated it and holds open the possibility of a different rule. Therefore, we do not rely on *Carpenter* in this decision.

Calhoun's legal argument is that the factual rendition supplied to the magistrate judge did not provide "reasonable grounds to believe that the . . . records . . . sought[] [we]re relevant and material to an ongoing criminal investigation," § 2703(d), but was instead a "fishing expedition" akin to a "general warrant" prohibited by the Fourth Amendment. But under the statutory standard of "reasonable grounds to believe the records are material to an ongoing investigation," we conclude that the facts provided here were sufficient.

The district court properly denied this motion.

## C.

The defendants claim the district court improperly admitted expert and lay testimony about the cell-tower-location evidence. We review the district court's admission of testimony at trial for an abuse of discretion. *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017).

Pembrook argues that the district court abused its discretion by allowing FBI Agents Christopher Hess and Brian Max to testify as expert and lay witness, respectively, about the cell-tower-location data, specifically about how the cell-site analysis placed phones linked to the defendants in proximity to the robberies. Pembrook relies primarily on *United States v. Reynolds*, 626 F. App'x 610 (6th Cir. 2015), for the proposition that such analysis is unreliable. The government answers that cell-site analysis is reliable, citing *United States v. Hill*, 818 F.3d 289, 299 (7th Cir. 2016) ("The science and methods upon which the technique is based are understood and well documented."), and argues that "*Reynolds* is flawed."[15]

Flawed or not, the cell-site analysis proffered in *Reynolds* differs significantly from the cell-site analysis here, based on the precision of the location. The cell-site analysis in *Reynolds* was focused on a cell-site's "sector" (the area in range of a specific tower) with the actual question being whether certain calls established that the phone owner was *outside* a certain sector, so as to exclude those phone owners as suspects. Here, in contrast, the cell-site analysis was of a much larger geographical area, and focused on whether the calls established that the

---

[15]The government argues that *Reynolds* misread its cited cases, relied on an outdated technical manual, and made unfounded assumptions. Moreover, *Reynolds* is unreported and, therefore, not controlling.

phone owners (from Philadelphia) were in the proximity of Medawar jewelry (Plainfield Township, Michigan, near Grand Rapids) at noon, Tapper's jewelry (West Bloomfield Township, Michigan, near Detroit) at 5:00 p.m., and New Buffalo, Michigan, the night before. At this level of geographic distance, cell-site analysis is established as reliable.[16] *See United States v. Lewisbey*, 843 F.3d 653, 659 (7th Cir. 2016) ("Using call records and cell towers to determine the general location of a phone at specific times is a well-accepted, reliable methodology."). In fact, even *Reynolds* appears to contradict Pembrook's argument. *See Reynolds*, 626 F. App'x at 617-18 (explaining that "such a challenge speaks to the weight of the evidence, and not to its inherent reliability, because there are identifiable, measurable, and scientifically accepted factors that determine a cell tower's maximum coverage range").

Pembrook continues on the same theme by arguing that the cell-site analysis—and, therefore, Hess's expert testimony about it—did not satisfy *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), or Federal Rule of Evidence 702(c). In testifying about how he used cell-site analysis to track the phones in question (i.e., Philadelphia to New Buffalo, to near Medawar at the time of the first robbery, to near Tapper's at the time of the second robbery, and back to Philadelphia), Hess explained that cell phones connect to a nearby tower but not necessarily the closest tower; rather the phones connect to the tower with the strongest signal, so distance is just one factor, along with others such as geography, physical obstruction, interaction with other towers, or the number of users in the system. A cell phone could connect to a tower as much as seven miles away, but obviously a phone in Philadelphia would not connect to a tower in Michigan, nor would a phone in Grand Rapids connect to a tower in Detroit (150 miles away).

Pembrook's argument that Hess's expert testimony was improper because cell-site analysis is unproven and unreliable under *Daubert* and FRE 702(c) unravels before it begins

---

[16]As the district court framed this: "The Government explains that it 'is not attempting to put a particular cell phone in a very specific location via Agent Hess'[s] testimony'; instead, it 'is attempting to show how the four phones in question originated in [] Philadelphia, Pennsylvania[,] on April 21, 2014, traveled in a similar pattern over the next few days, were in the Grand Rapids and West Bloomfield areas around the time[s] of the robberies, and traveled back to Philadelphia on April 22–23, 2014.' The Government 'concedes' that cell-site data cannot place Defendants 'in a precise location.'" *Pembrook*, 119 F. Supp. 3d at 597 (citations and editorial marks omitted).

because the particular form of cell-site analysis and corresponding testimony used here was reliable. To the extent that Pembrook contends that this form of cell-cite analysis has not been objectively tested or subjected to peer review, *Daubert*, 509 U.S. at 595, that contention appears to be incorrect. *See, e.g.,* Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J.L. & TECH. 3 (2011). And to the extent that Pembrook complains about the absence of error rate data, such analysis is inapplicable to the particular form of analysis and expert testimony at issue. Because the cell-site analysis and associated testimony presented here was reliable, the absence of a *Daubert* hearing or 702(c) inquiry does nothing to undermine the court's ruling.[17]

Finally, Pembrook argues that Agent Max, a lay witness, gave expert testimony in violation of FRE 701(c) and testified about parts of the investigation that were outside of his personal knowledge. But Agent Max did not explain how the cell-site analysis works, he testified about his use of reports to locate the suspects; that is, he used a report that matched a cell phone number to a tower and its location at a certain time, testimony that requires no expertise. Agent Max also testified about certain background activities (such as the tower dump, the delay in obtaining the records, and certain errors in those records, including a misspelling of Detroit) that led up to his portion of the investigation, all of which was within his personal knowledge even though he did not actually conduct those preliminary activities. This was legitimate lay testimony. *See United States v. Wilson*, 653 F. App'x 433, 443 (6th Cir. 2016).

The district court did not abuse its discretion by admitting this testimony.

---

[17]In his Reply Brief, Pembrook argues that a "forensic radio survey" was necessary to "pinpoint" the call origin, without which the cell site information was useless and Hess's testimony inadmissible. This is the first mention of a forensic radio survey, so this argument was forfeited, but even if it had been raised, it is irrelevant inasmuch as Hess was not "pinpointing" locations, as we explained in the text above.

Pembrook also complains that Hess "failed to disclose the serious pitfalls of cell-site analysis" and "failed to provide adequate disclaimers about the unreliability of his methodology." Of course, this would have been good information for Pembrook's attorney to draw out on cross examination.

### D.

The defendants claim a *Brady/Giglio* violation regarding background information on the inmate witness. If a defendant properly preserves his *Brady/Giglio* claim,[18] then our review is de novo. *United States v. Rafidi*, 829 F.3d 437, 446-47 (6th Cir. 2016). But if the defendant fails to properly preserve the claim, then our review is for plain error. *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004). We need not decide whether this claim was properly preserved because even under de novo review this claim would fail.

Pembrook argues that the government violated *Brady* and *Giglio* by withholding certain background information about jailhouse-informant-witness James Jenkins. He points specifically to Jenkins's complete Michigan Department of Corrections prison disciplinary records that defense counsel theoretically could have used for impeachment, though Pembrook does not specify how.

The government responds that Michigan *state* prison records do not fall within *Brady*'s coverage of materials that the *federal* prosecutor would have in its possession. *See, e.g., United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) (holding that a federal prosecutor had no duty to procure materials prepared for the state courts which were not otherwise under federal control). Moreover, disciplinary records, which would not bear on Jenkins's truthfulness, were neither material nor admissible at trial. *United States v. Phibbs*, 999 F.2d 1053, 1089 (6th Cir. 1993) ("Frequently, though, evidence associated with 'suspected' wrongdoing will not be admissible even for impeachment purposes, having no bearing on the capacity for truth of any witness."). Finally, because Pembrook failed to specify, let alone prove, how the records would have changed the trial's outcome, he has shown no prejudice from the alleged withholding.

This claim has no merit.

---

[18]*See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (holding that *Brady* requires the disclosure of an agreement between the prosecution and its witness).

**E.**

The defendants claim the district court erred by denying their *Bruton*-based motion to sever the trials. An alleged *Bruton* violation is a Confrontation Clause challenge, which we review de novo. *United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014).

Calhoun claims that the district court improperly refused to sever the trials when the government called inmate James Jenkins to testify about Pembrook's jailhouse admissions to the conspiracy and his identification of the other defendants. And Johnson claims that the inability to cross-examine co-defendant Pembrook about his conversation with Jenkins, particularly the alleged admission and identifications, violated his (and Calhoun's and Briley's) Sixth Amendment right to confront the witness against him, pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), which found such a violation due to a co-defendant's confession.

But "the Confrontation Clause has no bearing on nontestimonial out-of-court statements," *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009), which means that *Bruton* is limited to only testimonial statements, *United States v. Crowe*, 614 F. App'x 303, 307 (6th Cir. 2015) ("Because the *Bruton* principle is premised upon the Confrontation Clause, the principle applies only to testimonial statements."). And statements from one inmate to another are not testimonial. *Fields v. Birkett*, 461 F. App'x 454, 457-58 (6th Cir. 2012); *see also Davis v. Washington*, 547 U.S. 813, 825 (2006) (opining that the statements from one prisoner to another in *Dutton v. Evans*, 400 U.S. 74, 87-89 (1970) "were clearly nontestimonial").

This claim has no merit.

**F.**

The defendants claim that the evidence was insufficient to support their convictions. We review sufficiency of the evidence de novo, asking whether, upon viewing all of the evidence in the light most favorable to the prosecution, *any* rational juror could have found all of the elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Some facts are not in dispute. At noon on a Tuesday, four masked men robbed the Medawar jewelry store by force, brandishing guns and threatening employees. One was

Pembrook, whose participation was established by DNA and ballistic evidence. All four drove off together in a black Chrysler Town & Country minivan. At 5:15 p.m. that same day, three masked men similarly robbed the Tapper's jewelry store by force, brandishing guns and threatening employees. In the surveillance video, these three were dressed the same as the men involved in the earlier robbery and appeared to be the same men, minus Pembrook. They also drove off in a black Chrysler Town & Country minivan that appeared to be the same van as had been used in the earlier robbery. In the videos, these three and this van were also associated with a white Volkswagen Passat. None of this is in any reasonable dispute. On the other hand, no witnesses to the robberies could actually identify any of the robbers.

There is overwhelming evidence that Pembrook and three other robbers were guilty of the robbery, conspiracy, and firearms crimes as charged. *See United States v. Graewe*, 774 F.2d 106, 107-08 (6th Cir. 1985) ("[A] conspirator may be held liable of a substantive offense committed by co-conspirators provided the substantive offense was committed in furtherance of the conspiracy and as part of it."). The question is whether Briley, Calhoun, and Johnson were the three other robbers. More to the point, the question is whether the government proved it.

Briley claims that Graff's identification was tainted, unreliable, and irrelevant in that it did not place him at either robbery. And he says the other circumstantial evidence was severely flawed, to wit: (1) while the distinctive outfit of bomber jacket and long flannel shirt was seen in both the photo from his phone and certain surveillance videos, the government could not prove they were exactly the same or that others could not have had that same outfit, and that outfit did not appear in the robbery surveillance videos; (2) the images in the surveillance videos were not clear enough to conclusively match the suspect (alleged to be Briley) in the New Buffalo videos to the suspect in the jewelry store videos, and even the government argued only that the suspects had a "similar build" or "similar clothes"; and (3) while the government had tracked a cell phone with a number ending 7819 along the robbery pattern and had attributed that #7819-phone to Briley based on calls to his ex-wife, current girlfriend, daughter, and mother, Briley had presented certain evidence that his only cell phone number ended with 6615, and phone records

showed that the #6615-phone had been in Philadelphia, making and receiving texts and calls, during the April 21 to 23 timeframe of the robberies in Michigan.[19]

The government points to six things that, taken together, are sufficient to permit a rational juror to convict Briley: (1) the #7819-phone was linked to Briley by calls to his family and friends, followed the robbery pattern, and had nine calls on the day of the robberies to the Calhoun and Johnson phones; (2) the jury saw the Tapper's exterior video, in which Briley was recognizable getting out of the Passat, walking around, and returning to the black minivan (from which three masked robbers next emerged, wearing the same outfits as the Medawar robbers had worn); (3) the jury saw the surveillance video of the black minivan at the Medawar robbery and of both the Passat and minivan at the New Buffalo Comfort Inn the night before; (4) the jury saw the Shell station surveillance video with the "grainy" images, and heard testimony (from cashier Sue Graff) that identified Briley as one of the customers; (5) Briley's cell phone seized by police contained a photograph of him wearing the same recognizable outfit as in the Shell video and outside Tapper's; and (6) Pembrook called Briley from his hospital room the day after the robberies. This evidence is enough to support a juror's conclusion that Briley was one of the robbers, and Briley's arguments to the contrary do not undermine this conclusion in any meaningful way.

Calhoun claims that the district court erred by denying his motion for acquittal because the government's circumstantial evidence was insufficient: no witness identified Calhoun at either robbery, no evidence (testimonial or otherwise) proved that Calhoun ever had a gun or agreed to any conspiracy, the identification by the Shell station witness (Graff) was equivocal and unreliable, and no witness actually identified Calhoun as the renter of the Passat—the connection instead was based only on rental records, namely, his driver's license and credit card.

The government points to five things that, taken together, are sufficient to permit a rational juror to convict Calhoun: (1) the #0033-phone was linked to Calhoun by calls to his mother and girlfriend, as well as the recorded call to Enterprise in which he identified himself by

---

[19]This evidence was two-fold: when the police arrested Briley, he had the #6615-phone in his possession (not the #7819-phone, which was never physically connected to him); also, Briley introduced as evidence an email that he sent to his daughter from prison in which he wrote that his only cell phone number was the one ending 6615.

name, that phone followed the robbery pattern, and that phone had 15 calls on the day of the robberies to the Briley and Johnson phones; (2) Calhoun's driver's license and credit card were used to rent the white Volkswagen Passat that was with the black minivan in the videos from the New Buffalo Comfort Inn and Shell station on April 21 and outside Tapper's before the robbery; (3) when arrested, Calhoun was with Briley and was carrying the driver's license and credit card used to rent the Passat; (4) Sue Graff identified Briley as one of the customers in the Shell station on April 21; and (5) the jurors watched the multiple surveillance videos for themselves. This is enough evidence to support a juror's conclusion that Calhoun was one of the robbers, and his arguments to the contrary do not undermine this conclusion in any meaningful way.

Johnson admits to being in the vicinity of the robberies, but argues that the government did not prove that he was one of the robbers. He also argues that nothing proves that the use of a gun in the conspiracy was separate and distinct from the use of a gun in the Tapper's robbery.

The government points to three things that, taken together, are sufficient to permit a rational juror to convict Johnson: (1) the #1434-phone that he gave to a friend who gave it to the FBI, was linked to Calhoun by over 100 calls to his girlfriend, followed the robbery pattern, and called the Briley and Calhoun phones numerous times throughout the day of the robberies; (2) Johnson's friend—to whom he had given the cell phone—identified Johnson in the Shell station surveillance video; (3) the jurors watched the surveillance videos for themselves, including video of Johnson loitering outside Tapper's before the robbery and the video of the suspect wearing the same outfit as Johnson had been wearing in his Facebook page photos. This is enough evidence to support a juror's conclusion that Johnson was one of the four robbers, and his arguments to the contrary do not undermine this conclusion in any meaningful way.

These sufficiency-of-the-evidence claims fail.

**G.**

The defendants claim the verdict on the second § 924(c) charge violated due process. Calhoun and Johnson argue that the § 924(c) charge in Count 4 was duplicative of the § 924(c) charge in Count 2, because both were predicated on the same underlying conduct (the Tapper's robbery), subjecting them to double jeopardy in violation of the Constitution. The district court

disagreed, explaining at least three times[20] that Count 2 addressed the defendants' decision to use a firearm during the Tapper's *robbery* while Count 4 addressed the decision to use a firearm in connection with the *conspiracy* (to travel across four states and rob Tapper's and Medawar), which were separate crimes. Johnson protests that "there is no way to distinguish the use of a gun in the conspiracy from the use of a gun at the Tapper's robbery," so they must be the same crime, not two separate crimes.

Briley also argues that the counts are duplicative, quoting *United States v. Vichitvongsa*, 819 F.3d 260, 269 (6th Cir. 2016) ("the government must prove both a use, carry, or possession, *as well as* a qualifying crime"), and insists that the robbery and conspiracy offenses occurred simultaneously, were based on the same course of conduct, and were limited to only one actual act of brandishing. To be sure, *Vichitvongsa* holds that "*one* affirmative firearm act (brandishing a handgun) [that] simultaneously commit[s] *two* predicate offenses (conspiring to commit Hobbs Act robbery and to traffic drugs), . . . does not support two § 924(c) convictions," because Vichitvongsa only used the gun once. *Id.* at 267. Thus, we acknowledged that "the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode [is] lawful," *id.* at 269 (quotation marks omitted), but "the defendant must use, carry, or possess a firearm—even if it is the same [firearm]—more than once," *id.* at 269, so the question is "whether the defendant made more than one choice to use, carry, or possess a firearm," *id.* at 270. Briley is right about the law but wrong about the facts. As the district court explained repeatedly: the defendants used, carried, or possessed a firearm in (1) possessing and transporting for the purpose of the robberies (conspiracy); (2) robbing the Medawar store (here charged as part of the conspiracy); and (3) robbing the Tapper's store (robbery). Focusing on the Medawar robbery as the basis for the conspiracy, the two crimes (Medawar-based conspiracy and Tapper's robbery) did not occur simultaneously, were not the same course of conduct, and were not limited to only one actual act of brandishing. These were two separate crimes.

---

[20]Calhoun raised this argument in a pre-trial motion to dismiss either Count 2 or 4, which the court denied. Calhoun raised it again during trial in his motions for acquittal, which the court denied. And Calhoun raised this argument in his post-trial motion for a new trial or relief from judgment. Again, the court denied the motion. It does not appear from the record or from Calhoun's rendition in his brief that he modified this argument in any way at any point.

Pembrook argues that, given the evidence that he did not physically participate in the Tapper's robbery (his having already been shot),[21] the court's verdict form limited the jury to either of two improper bases for convicting him on the second § 924(c) use-of-a-firearm charge: either by implicitly convicting him of the Medawar *robbery*, which was not charged and was outside the venue of the Eastern District of Michigan; or by convicting him twice for the same conspiracy charge, in that his "participation" in the Tapper's robbery—at most, aiding and abetting—is the same conduct as the conspiracy. The question on the verdict form was this:

> If guilty as to Count Four [the second § 924(c) charge], we unanimously find that the use and carry of the firearm was during and in relation to, conduct separate and distinct from the conduct charged in Count One [the Tapper's robbery][.]

R. 146 (verdict form). The jury convicted Pembrook on Count 1.

Beguiling though Pembrook's argument might be, his problem is that aiding-and-abetting is merely a constructive version of the substantive robbery offense and is, therefore, a separate crime from conspiring. *United States v. Bradley*, 421 F.2d 924, 927-28 (6th Cir. 1970) (relying on *Pereira v. United States*, 347 U.S. 1, 11 (1954) ("Aiding, abetting, and counseling are not terms which presuppose the existence of an agreement.")). Therefore, the government charged —and the jury convicted—Pembrook on two separate crimes: aiding-and-abetting the Tapper's robbery and conspiring via the Medawar robbery. And, as has already been explained herein, the government produced sufficient evidence of each to support the two convictions.

This claim has no merit.

### H.

The defendants claim that 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague, such that the § 924(c) minimum sentences do not apply and resentencing is warranted. This argument is that the conspiracy in this case (conspiracy to commit Hobbs Act robbery) is not a crime of violence because § 924(c)(3)(B) is unconstitutionally vague and therefore invalid, as the Court

---

[21]Note that the evidence does not show or prove that Pembrook was entirely absent from the Tapper's robbery; rather, there is a lack of evidence that he was inside the Tapper's store during the robbery. Where he actually was is not in evidence, but he did not show up at the hospital until nearly twelve hours after the robbery.

found § 924(e)(2)(B) to be in *Johnson v. United States*, 135 S. Ct. 2551 (2015). The problem for the defendants is that we have, since *Johnson*, held that § 924(c)(3)(B) is not vague (i.e., it is valid), *see United States v. Taylor*, 814 F.3d 340, 376-79 (6th Cir. 2016). But the defendants preserve this claim on the possibility that the case of *Sessions v. Dimaya*, No. 15-1498, 137 S. Ct. 31 (2016), pending in the Supreme Court on the question of whether 18 U.S.C. § 16(b) is unconstitutionally vague per *Johnson*, will result in their favor. Their theory, which they say was raised at oral argument in *Dimaya* (Jan. 17, 2017), is that § 16(b) and § 924(c)(3)(B) are materially identical, so if one is vague then the other must be also.[22]

Were the defendants correct that § 924(c)(3)(B) is invalid *and* the conspiracy (and Hobbs Act robbery as well, Pembrook claims[23]) is not a crime of violence, such that the § 924(c) sentencing minimum does not apply, they would be entitled to resentencing. But that is not correct under our presently prevailing law. *Taylor*, 814 F.3d at 376-79.

This claim fails per our decision in *Taylor*, though it is preserved for possible reconsideration pending the forthcoming decision in *Dimaya*.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[22]Calhoun concedes that "[t]his issue was not specifically raised in the district court." But, given that *Johnson* is retroactive, per *Welch v. United States*, 136 S. Ct. 1257 (2016), then *Dimaya* would likely apply anyway and even preservation may not be unnecessary.

Calhoun urges us to reverse *Taylor* (he says "modify" but his desired modification is actually a reversal) on two bases: (1) the intervening Supreme Court cases of *Welch* and *Mathis v. United States*, 136 S. Ct. 2243 (2016), have overruled it; and (2) two subsequent Sixth Circuit cases have found to be unconstitutional certain statutes with "almost identical" language, in *United States v. Pawlak*, 822 F.3d 902 (6th Cir. 2016) (abrogated), and *Shuti v. Lynch*, 828 F.3d 440 (6th Cir. 2016). The first contention is simply not true; as to the latter, even if it were relevant, in the time since Calhoun filed his brief, the Supreme Court abrogated *Pawlak* in *Beckles v. United States*, 137 S. Ct. 886 (2017), and the government filed a certiorari petition in *Shuti*, which is pending.

[23]The government argues that Hobbs Act robbery is a crime of violence under the force clause, § 924(c)(3)(A), without regard to the residual clause, so *Dimaya* would have no effect on that count regardless.