**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1136-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KADEEM I. CHARLES, a/k/a
BAVAGE CHARLES,

      Defendant-Appellant.

_____

Submitted October 28, 2020 – Decided December 18, 2020

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-01-0065.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, of counsel and on the brief).

Lindsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Meredith L. Balo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Kadeem I. Charles appeals from a September 15, 2017 judgment of conviction and sentence. We reverse and remand for further proceedings and retrial.

We discern the following facts from the evidence presented at the joint trial of Charles and co-defendant Gregory J. Herbert.[1] Herbert, Charles, and Michael Onyeagoro met at Charles's house for a party on December 19, 2013. Onyeagoro testified at trial that the trio left Charles's shortly after midnight to "discuss[] locations or persons that [they could] rob" and eventually decided to rob a gas station.[2]

The three went forward with the plan. At approximately 2:30 a.m., Onyeagoro distracted the gas station attendant by driving into the gas station and asking for gas. As the attendant pumped gas, Charles pointed a BB gun at him while Herbert stole computer equipment. The trio then fled the scene.

Hillside Police Department received a "holdup alarm" from the BP gas station on Route 22 at 2:30 a.m. Police found Onyeagoro waiting for Herbert and Charles in his car nearby, which matched the description given by the gas

---

[1] In our separate opinion in the companion appeal filed by Herbert, we reversed Herbert's convictions and remanded for a N.J.R.E. 104 hearing and retrial. State v. Herbert, No. A-5556-17 (App. Div. Dec. 18, 2020) (slip op. at 18-24).

[2] Onyeagoro pled guilty to second-degree conspiracy and turned State's witness.

station attendant. They observed a knife under the seat of the car and arrested Onyeagoro for possession of a weapon.

The information obtained from Onyeagoro led to the arrests of Charles in July 2014 and Herbert in August 2014. Police searched Charles's home in Irvington and seized two BB guns, a ski mask, a knife, clothing, and gloves.

Hillside Police Detective Sergeant Cosimo Tripoli took a statement from Herbert. Herbert denied being in Hillside at the time of the crimes or ever being in Onyeagoro's car.

The State proffered Adam Durando as an expert in cellular telephone records, cellular mapping programs, and cell-site analysis. The court conducted a N.J.R.E. 104 hearing on the admissibility of Durando's testimony. During the hearing, Durando testified that, as part of his job, he makes sure that all Sprint customers have cellular service when they attempt make a call. This requires a customer's phone to remain in constant contact with a cell tower, which reveals the general location of the customer's phone. Durando testified that there may be occasion when a cell phone does not connect to the nearest cell site because a different tower might provide a better signal to the customer due to nearby buildings, terrain, and local topology. Durando explained, however, that Sprint takes into

3

consideration the local terrain, topology of a tower location, and cell-site traffic when designing tower sites.

Durando further testified that he reviewed the cell phone numbers registered to Herbert and Charles and used repoll numbers to identify the relevant cell tower sites to map the calls at issue in this case. He explained that he reviewed the cell phone numbers with Map Info, a commercially accepted mapping tool used throughout the industry that graphically represents where Sprint's sites are located relative to the streets. Durando testified that although he could not determine the exact location of a cell phone during a call, he could confirm that a call was placed somewhere within the site's coverage area, which is usually around seven miles. Durando also testified that a "drive test" is sometimes performed to cure a customer's complaint about poor service, but he was unable to conduct a drive test for this case because he did not have all the information necessary.

The court granted the State's motion to permit Durando to testify as an expert, determining that Durando was highly qualified and "ha[d] sufficient expertise" in the fields of cellular telephone records, cellular mapping program, and cell-site analysis. It noted that Durando had twenty-five years of experience and received forty hours of training annually.

The court found the State met its burden of proving that Durando's proffered testimony was "generally accepted among those in the profession." It pointed to case law specifically addressing the reliability and general acceptance of cell-site analysis to determine the general location of a cell phone. The court noted that the State sought to introduce evidence of defendants' general location based on the use of specific cell towers and sectors rather than to pinpoint the exact location of the cell phone user. It thus concluded that "[t]estimony concerning the location of cell towers, the sectors used for each call, and the general location" of cell phones when connected to each tower "[a]re the product of reliable principles and methods[.]"Lastly, the court concluded that "[a]ny questions concerning the mapping data and the reliability of testimony" affect "the weight of his testimony," not its admissibility.

The trial commenced on June 6, 2017. We briefly recount the pertinent testimony, objections, and evidentiary rulings made by the trial court.

The State called Onyeagoro to testify about the content and background of text messages between Onyeagoro, Charles, and Herbert on the night of the robbery. The first text message was from Onyeagoro to Charles; it read: "Text me this n--ga Herbert['s] number[.]" Charles replied, "Ight[.]"

Onyeagoro testified that he texted Herbert to "[contact him] back [about] that ish we'd talked about its still in the office[.]" He explained that when he referred to the office, he meant "the safe that is in the office at [his] job." Onyeagoro explained that another text message to Herbert, which read: "All right. Nothing crazy. A quick grab and go[,]" meant "a quick in and out" robbery of the office where Onyeagoro worked. He testified that the text message referred to a planned robbery.

The State introduced text messages between Onyeagoro and Herbert's cell phones. Both defense counsel objected to the admission of the text messages, claiming lack of authentication based on the impossibility of knowing whether Herbert personally sent the messages even though they were sent to or from his cell phone. The court overruled the objection, finding that defendants' argument went to the weight of the evidence, not its admissibility. Defense counsel did not object to the contents of the messages regarding their reference to prior bad acts and resulting prejudicial impact.

Soon thereafter, Onyeagoro testified that he, Herbert, and Charles attended a party that night and, after the party, he drove the trio around and were "not particularly doing anything. [They] were just discussing locations or persons that [they could] rob." Charles suggested they rob the BP station on

Route 22. Onyeagoro testified that he initially refused "because it was getting late but [Charles and Herbert] insisted because the profit of that previous night into the morning was low." We view this as a reference to another robbery the three had committed.

Both defense attorneys objected and moved for a mistrial because Onyeagoro was implicating defendants in other crimes. The court denied the motion but sustained the objection since the testimony implied that defendants committed other, uncharged crimes. It found that although Onyeagoro's statement began to implicate defendants of a different crime, his testimony could be interpreted in other ways and thus did not warrant a mistrial. The court struck Onyeagoro's statement and directed the jury to "disregard it and not to consider it as evidence in this case" but did not provide further instruction to avoid shedding more light on the substance of the testimony. Defense counsel agreed.

According to Onyeagoro, during the robbery of the gas station, Charles had a gun and Herbert had a knife. Onyeagoro pulled up to a pump and asked for $20 worth of gas. Charles put the attendant in a choke hold and placed the gun at his head. Charles or Herbert shouted, "give us the f--king money, where is the f--king money at." Onyeagoro identified Charles and Herbert as the men in the surveillance video. Herbert told Onyeagoro to leave; he pulled away from

7

the gas station without his gas cap.  Onyeagoro was stopped by police shortly thereafter.

During cross-examination, defendants attacked Onyeagoro's credibility by demonstrating that in several instances, his testimony on direct materially varied from what he told the police during the investigation.  Defendants attempted to show that Onyeagoro implicated Charles and Herbert in order to obtain a favorable plea agreement that reduced his exposure from first-degree to second-degree robbery and resulted in a downgraded three-year prison term.

The State presented Durando's expert cell-site analysis testimony.  Durando testified that he used the defendants' phone numbers and cell-site data to map out the location of the defendants' phones at the time of the robbery.  Further, Durando testified that defendants' phones were within seven miles of the cell tower they connected to.

The State also presented New Jersey State Police Detective Sergeant First Class Brett Bloom, who is assigned to the Firearms Investigation Unit as a firearms expert.  The gun in evidence was a BB gun pistol.  He testified without objection that neither Charles nor Herbert had ever been issued a permit to carry a handgun, a permit to purchase a handgun, a firearm identification card, or a permit for an assault weapon in the State of New Jersey.  He further testified

that that under New Jersey law, a BB gun is considered a firearm and is subject to the same permitting procedures.

At the close of the State's case, defendants moved for judgment of acquittal on the unlawful possession of a firearm count based on the lack of evidence that the BB gun was operable. The court granted the motion, noting "the State has not called an expert in regard to operability." It explained that N.J.S.A. 2C:39-5(b) requires the State to prove that the firearm at issue was "originally designed or manufactured to fire or eject any solid projectile [or] ball[.]" Because the State did not call an expert regarding operability, the court found the "jury would have to speculate" about whether the BB gun "was originally designed or manufactured to eject" a ball projectile.

On the other hand, the court held that a BB gun is a firearm under N.J.S.A. 2C:39-4(a) because operability is not an element of possession of a firearm for an unlawful purpose. Neither defense counsel argued for judgment of acquittal of the aggravated assault by pointing a firearm charge.

During its summation, the State discussed Durando's expert testimony. The State argued that, according to Durando's testimony, defendants were in the general area of the crime and that they were together.

A-1136-17T4

On June 29, 2017, the jury acquitted Herbert and Charles of robbery but found both guilty of the lesser-included offenses of fourth-degree aggravated assault by pointing a firearm and disorderly persons theft; second-degree conspiracy to commit robbery; and second-degree possession of a weapon for an unlawful purpose.

At sentencing, the State argued that the court should find aggravating factor one ("nature and circumstances of the offense"), N.J.S.A. 2C:44-1(a)(1), noting that it was Charles who "held the gun to the victim's temple, . . . held him in the choke hold," and "shoved him to the ground." The State further argued that the Graves Act, N.J.S.A. 2C:43-6(c), applied to possession of a weapon for an unlawful purpose even though it was a BB gun.

Defense counsel argued that the court should find mitigating factors one ("defendant's conduct neither caused nor threatened serious harm"), N.J.S.A. 2C:44-1(b)(1); two ("defendant did not contemplate that his conduct would cause or threaten serious harm"), N.J.S.A. 2C:44-1(b)(2); and seven ("defendant has no history of prior delinquency or criminal activity"), N.J.S.A. 2C:44-1(b)(7). Charles, who was twenty-five years old when sentenced and an army veteran, had one prior disorderly persons conviction.

A-1136-17T4

Defense counsel also argued that the Graves Act should not apply to the possession of a weapon for an unlawful purpose, because "the Graves Act defines handgun in a way that is different from the general definition of a firearm for the . . . remainder of the criminal code." He contended that the Graves Act excepts BB guns.

The court found that aggravating factor nine (need for deterrence), N.J.S.A. 2C:44-1(a)(9), outweighed mitigating factor seven ("no history of prior delinquency or criminal activity"), N.J.S.A. 2C:44-1(b)(7). (Da13). The court did not find aggravating factor one or mitigating factors one and two, noting that Charles held the gun. The court found the victim "did not know that it was a BB gun" and "was scared for his life." The court explained that he "probably thought it was a real gun" because "it looked like a real gun."

Following merger of the aggravated assault by pointing a firearm count into count four, Charles was sentenced to an aggregate seven-year term. More specifically, Charles received a six-month term for the disorderly persons theft; a seven-year term, subject to the mandatory periods of parole ineligibility and parole supervision under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the conspiracy to commit robbery; and a seven-year term, subject to a forty-two-month period of parole ineligibility pursuant to the Graves Act

11

N.J.S.A. 2C:43-6(c), for the possession of a weapon for an unlawful purpose.

All terms run concurrently.  This appeal followed.

Charles raises the following points for our consideration.

POINT ONE

THE TRIAL COURT IMPROPERLY ADMITTED THE EXPERT TESTIMONY OF ADAM DURANDO AS TO TELEPHONE CELL SITE LOCATION INFORMATION.

POINT TWO

THE TRIAL COURT ERRED BY REFUSING TO DISMISS THE COUNTS CHARGING POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE AND AGGRAVATED ASSAULT BY POINTING A FIREARM.  (Partially Raised Below).

POINT THREE

THE TRIAL COURT'S DENIAL OF DEFENDANT'S APPLICATION FOR A MISTRIAL WAS ERROR WHICH DENIED DEFENDANT A FAIR TRIAL.

POINT FOUR

THE TRIAL COURT IMPROPERLY IMPOSED THE MANDATORY MINIMUM SENTENCE OF THE GRAVES ACT AS PART OF DEFENDANT'S SENTENCE FOR POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE.

POINT FIVE

DEFENDANT'S SENTENCE OF SEVEN YEARS SUBJECT TO THE NO EARLY RELEASE ACT WAS EXCESSIVE.

We address these points in the order they are raised.

## I.

Charles argues that the Durando's expert cell-site analysis testimony was improperly admitted. First, he contends that the State failed to demonstrate that Durando's testimony was generally accepted by the scientific community. Second, he contends that the analysis of the cell-site information did not materially contribute to proving the location of defendants' cell phones at the time of the robbery and should have been excluded. We are unpersuaded.

## A.

A trial court's evidentiary determination that a witness is qualified to present expert testimony under N.J.R.E. 702 is reviewed for abuse of discretion "and will only be reversed for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)). N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

A-1136-17T4

The party offering the expert testimony bears the burden of establishing its admissibility. State v. Harvey, 151 N.J. 117, 167 (1997) (citing Windmere, Inc. v. Int'l Ins. Co., 105 N.J. 373, 378 (1987)). Our Supreme Court has set out a three-part test for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Jenewicz, 193 N.J. at 454.]

Charles does not dispute that the subject matter of the proffered testimony was beyond the ken of the average juror and does not question Durando's level of expertise. (Db16). He contests only the second prong under Jenewicz, arguing that the State did not demonstrate the proffered testimony was sufficiently reliable and generally accepted by the scientific community. (Db15, 17-20).

The State relies on Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), for the proposition that it satisfied the second prong because cell-site tests have gained "general acceptance in the particular field." It further contends that it demonstrated that Durando's testimony was sufficiently reliable.

14

The test for admissibility in criminal cases is "whether the scientific community generally accepts the evidence." Harvey, 151 N.J. at 170 (citing State v. Spann, 130 N.J. 484, 509 (1993); Windmere, 105 N.J. at 386). "General acceptance, however, does not require complete agreement over the accuracy of the test or the exclusion of the possibility of error." Id. at 171. To establish general acceptance, "the party proffering the evidence need not show infallibility of the technique nor unanimity of its acceptance in the scientific community." State v. Cassidy, 235 N.J. 482, 492 (2018). Here, the State must prove that the cell-site analysis methodology "and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable." Harvey, 151 N.J. at 171.

"Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question we review de novo." State v. J.L.G., 234 N.J. 265, 301 (2018). "When reviewing a decision on the admission of scientific evidence, an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." Harvey, 151 N.J. at 167.

The trial court relied upon <u>United States v. Jones</u>, 918 F. Supp. 2d 1 (D.D.C. 2013), which recognized the reliability of cell-site analysis to determine the relative location of a cell phone at a particular time. Notably, defendant does not assert that there is controlling case law that finds cell-site analysis unreliable or otherwise inadmissible. Instead, defendant argues simply that cell-site data is not the most helpful information.

Having carefully reviewed the record in light of the applicable precedents, we affirm the trial court's conclusion that historical cell-site data analysis is generally accepted in the scientific community and sufficiently reliable to be admitted into evidence to show the general location of a cell phone at a particular time. The trial court properly found that cell-site analysis is a sufficiently reliable method to determine the approximate location of a cell phone at the time an incident occurred.

There is no published opinion in this State squarely addressing the admissibility of historical cell-site data analysis in a criminal matter, but a number of out-of-state and federal precedents, however, are instructive.

Federal courts have been receptive to expert testimony regarding historical cell-site data analysis. "District courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally

done so." United States v. Hill, 818 F.3d 289, 297 (7th Cir. 2016); see United States v. Weathers, 169 F.3d 336, 339 (6th Cir. 1999) (discussing admission of expert testimony on historical cell-site data analysis); United States v. Reynolds, 626 Fed. App'x 610, 618 (6th Cir. 2015)[3] (allowing historical cell site data analysis to show where parties other than defendant were not); United States v. Schaffer, 439 F. App'x 344, 347 (5th Cir. 2011) (concluding that the field of historical cell-site data analysis "is neither untested nor unestablished"); Jones, 918 F. Supp. 2d at 5 (finding "the use of cell phone location records to determine the general location of a cell phone" to be both widely accepted and "based on reliable methodology"); United States v. Evans, 892 F. Supp. 2d 949, 955-56 (N.D. Ill. 2012) (finding "granulization theory" to be unreliable science, but still finding other historical cell site data analysis methods have been adequately tested).

So too have the courts of other States. See State v. Johnson, 797 S.E.2d 557, 563 (W.Va. 2017); Pullin v. State, 534 S.E.2d 69, 71 (Ga. 2000); Wilson

---

[3] We cite these cases for the sake of completeness, noting that although the cases are reported in the Federal Appendix, they are not published and, therefore, do not constitute precedent. R. 1:36-3. We note, however, that Rule 32.1 of the Federal Rules of Appellate Procedure permits citation to opinions reported in the Federal Appendix.

v. State, 195 S.W.3d 193, 200-02 (Tex. Crim. App. 2006) (allowing a Sprint employee to testify as an expert on historical cell site data analysis).

In Hill, the Seventh Circuit found that "[h]istorical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one.  It shows the cell sites with which the person's cell phone connected, and the science is well understood."  818 F.3d at 298 (citing Evans, 892 F. Supp. 2d at 956).

An expert may rely on any sufficiently reliable test; the test need not be the most accurate.  Ibid.  Because cell-site data is sufficiently reliable and may indicate the general whereabouts of a person's cell phone, the trial court properly admitted Durando's testimony.

## B.

Charles further argues that "Durando's testimony lacked the capacity to contribute materially to the ascertainment of the truth."  We disagree and find Durando's expert testimony was relevant.

"'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action."  N.J.R.E. 401.  An explanation of how cell towers work and the general location of defendants' cell phones on the night of the crimes would be helpful to the jury

in understanding the State's claims about the movements and whereabouts of Charles and his co-conspirators. The cell-site analysis would allow the jury to narrow the possible location of their cell phones during the course of the conspiracy.

## II.

Charles next argues that the trial court erred by not dismissing the counts charging possession of a firearm for an unlawful purpose and aggravated assault by pointing a firearm. We disagree for substantially the same reasons we rejected a similar argument raised by Herbert. See Herbert, slip op. at 38-42.

As we explained in Herbert, a defendant may move for judgment of acquittal under Rule 3:18-1 if the State has not proven each of the elements of a crime. A motion for judgment of acquittal may be granted if, viewing all the evidence in the light most favorable to the State, "as well as all of the favorable inferences which could reasonably be drawn therefrom," no "reasonable jury could find guilt of the charge beyond a reasonable doubt." State v. Reyes, 50 N.J. 454, 458-59 (1967) (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961)). Such instances of guilt may be "based upon circumstantial evidence." State v. Franklin, 52 N.J. 386, 406 (1968) (citing Fiorello, 36 N.J. at 86).

A-1136-17T4

The <u>Reyes</u> standard applies to appellate review of the sufficiency of evidence. <u>State v. Kittrell</u>, 145 N.J. 112, 130 (1996). "In deciding whether the trial court was correct in denying [a <u>Reyes</u>] motion, we . . . take into account only the evidence on the State's case, unaided by what defendant later developed at trial." <u>State v. Lemken</u>, 136 N.J. Super. 310, 314 (App. Div. 1974).

Charles moved under <u>Reyes</u> to dismiss the charges of unlawful possession and possession for unlawful purpose. The trial court dismissed the unlawful possession of a weapon charge but not the possession of a weapon for an unlawful purposes charge.

Defense counsel did not move to dismiss the aggravated assault by pointing a firearm charge. On the contrary, defense counsel moved to include the aggravated assault charge as a lesser-included offense. Accordingly, as to aggravated assault charge, we review for plain error. <u>R.</u> 2:10-2.

A person is guilty of possession of a weapon for an unlawful purpose if they possess a firearm with the purpose to use it unlawfully. N.J.S.A. 2C:39-4(a)(1). A firearm is defined under the statute as:

> any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of

20

an inch in diameter, with sufficient force to injure a person.

[N.J.S.A. 2C: 39-1(f).]

The same definition of firearm applies to aggravated assault by pointing a firearm charge, "whether or not the actor believes it to be loaded." N.J.S.A. 2C:12-1(b)(4); N.J.S.A. 2C:39-1(f).

A BB gun is a firearm within the definition of N.J.S.A. 2C: 39-1(f). State v. Mieles, 199 N.J. Super. 29, 37-38 (App. Div. 1985). An inoperable BB gun also qualifies as a firearm under the statute. State v. Austin, 335 N.J. Super. 486, 490 (App. Div. 2000). A "fake or toy gun" does not. State v. Gantt, 101 N.J. 573, 584 (1986).

As to possession of a firearm for an unlawful purpose, the State need not prove the operability of a firearm at the time of the offense; it need only prove the firearm was originally designed as operable. Id. at 584-85. The trial court need only be satisfied "that the device was originally designed to deliver a potentially-lethal projectile and hence 'real.'" Id. at 589. To that end, "an object's authentic design may be inferred from appearance or based on lay testimony, but in no case is it dependent upon empirical examination of the weapon." Id. at 589-90. Indeed, the Gantt Court found sufficient evidence

existed to support the finding that the weapon involved was a "firearm" even though the weapon used in the robbery was never recovered. Id. at 591.

Here, as in Gantt, there was no evidence or testimony to contradict the conclusion that the BB gun was real. See ibid. Defendants offered no evidence that the weapon was a toy or fake. Accordingly, the trial court was "justified in concluding that the [BB gun] was real and therefore a firearm within the meaning of N.J.S.A. 2C:39-1(f)." Ibid. Therefore, the trial court did not err by denying a judgment of acquittal on that count.

The same analysis applies to the aggravated assault by pointing charge. An instrument may be regarded as a firearm for purposes of aggravated assault by pointing a firearm without showing that the instrument was operable at the time of the offense. Mieles, 199 N.J. Super. at 38-39. Further, "both loaded and unloaded weapons should be considered to be firearms in prosecutions for aggravated assault under N.J.S.A. 2C:12-1(b)(4)." Id. at 38 (citing State v. Bill, 194 N.J. Super. 192, 198 (App. Div. 1984)).

On the other hand, the State must prove the operability of a firearm to convict defendant of unlawful possession of a weapon. See N.J.S.A. 2C:39-5(b). Indeed, as to that charge, the trial judge recognized that the jury would

need to speculate as to the operability of the BB gun without expert testimony. No such evidence was presented. The trial court properly dismissed that count.

## III.

Charles next argues that the denial of his application for a mistrial following a certain aspect of Onyeagoro's testimony on direct was error that denied him a fair trial. He points to Onyeagoro's response to the prosecutor's question on what he and the defendants talked about while they were in Onyeagoro's car on December 20, 2013. Onyeagoro stated: "In the beginning I refused because it was getting late but they insisted because the profit of that previous night into the morning was low and –." Herbert's counsel began to object, and the court heard counsel at sidebar.

The court advised the prosecutor that it thought Onyeagoro "was beginning to talk about other crimes. Obviously[,] that's a cause for concern." The prosecutor responded that during a prior meeting several months earlier, Onyeagoro told him that he, Charles, and Herbert "had participated in a number of robberies." The prosecutor stated he specifically told Onyeagoro "that when he does come to testify[,] he cannot talk about those other robberies." The court stated it was "going to strike his answer to that question [and] ask the jury not to consider it."

23

Herbert's counsel moved for a mistrial, noting that the "jury has now heard information that's going to make them believe that our client did other robberies." The prosecutor opposed a mistrial, asserting that what Onyeagoro said "may be open to many different interpretations, such as his previous discussion that he's unemployed, low in cash. It could refer to the fact profits were low from them not working."

The court declined to declare a mistrial. It noted that Onyeagoro "did not say anything about a prior robbery [or] anything about a prior crime. He said profits were low from the night before which can be interpreted [in] many different ways." The court suggested that it strike Onyeagoro's answer from the record and tell the jury they are not to consider it.

Charles's counsel then joined in the application for a mistrial and stated, "but short of that I believe that the next best thing is to strike it." Herbert's counsel did not object to the court's suggestion to strike the answer and telling the jury not to consider it without giving a curative instruction "[t]hat would only highlight any possible interpretation." Charles's counsel also agreed with that approach. The court then told the jury that it struck the witness's last answer from the record and asked the jury to disregard it and not to consider it as evidence in the case.

Charles contends that Onyeagoro's injection into the case that defendants were involved in other crimes denied Charles a fair trial. Counsel noted that the victim did not testify at trial, there were no other eyewitnesses, the perpetrators wore ski masks, and the only witness who could tie Charles to the robbery was Onyeagoro, who admitted his complicity. Counsel argued that since Onyeagoro's answer "had the capacity to lead the jury to a result it might not otherwise have reached," a mistrial should have been granted.

We do not view Onyeagoro's answer in isolation. Instead, we consider it in conjunction with the admission of text messages about other uncharged robberies without a limiting instruction.[4]

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." N.J.R.E. 404(b)(1). Accordingly, "[e]vidence regarding other specific acts may not be used to prove the commission of a particular act on a particular occasion, unless they establish

---

[4] We recognize that unlike Herbert, Charles did not raise the issue of the admission of the text messages in this appeal. The text messages involve the same subject matter as Onyeagoro's answer and exacerbate its impact. An "appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court." R. 2:10-2.

habit or routine practice under N.J.R.E. 406." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1(b) on N.J.R.E. 404 (2020).

Evidence of other crimes and bad acts "may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute." N.J.R.E. 404(b)(2). Thus, evidence of a prior bad act may be admissible to establish a "common scheme or plan, a signature crime, motive, and most frequently, to impeach the accused who takes the witness stand, but only through a conviction." State v. Weeks, 107 N.J. 396, 406-07 (1987).

Rule 404(b) is based on "the inordinate prejudice to the defendant inherent in other-crimes evidence." State v. Hernandez, 334 N.J. Super. 264, 269 (App. Div. 2000), aff'd as mod., 170 N.J. 106 (2001). "The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is 'a "bad" person in general.'" State v. Cofield, 127 N.J. 328, 336 (1992) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987) (citation omitted)).

Even where other bad acts are used for an admissible purpose, trial courts should "take pains to instruct juries carefully and comprehensively, with ample reference to the specific evidence and issues in a case, on the limited relevance

of other[ bad act] evidence." State v. Stevens, 115 N.J. 289, 309 (1989). The trial court must provide a limiting instruction to the jury "both when the evidence is first presented and again as part of the final jury charge." State v. Garrison, 228 N.J. 182, 200 (2017) (quoting State v. Rose, 206 N.J. 141, 161 (2011)).

Before a court determines whether a prior bad act is admissible for a particular purpose, it should determine first whether the evidence relates to a prior bad act or whether it is intrinsic to the charged offense. State v. Brockington, 439 N.J. Super. 311, 325 (App. Div. 2015) (quoting Rose, 206 N.J. at 179). Evidence that is intrinsic to a crime, while needing to satisfy the rules relating to relevancy and undue prejudice, "is exempt from the strictures of Rule 404(b)." Rose, 206 N.J. at 177-78.

Intrinsic evidence is limited to two categories: (1) evidence that "directly proves" the charged offense; and (2) evidence that, when "performed contemporaneously with the charged crime," facilitates "the commission of the charged crime." Brockington, 439 N.J. Super. at 327-28 (quoting Rose, 2016 N.J. at 180). As to the second category of intrinsic evidence, the temporal proximity between the uncharged bad act and the indicted crime must be contemporaneous, not simply "close in time[,]" and the link between the same

must be "meaningful." Brockington, 439 N.J. Super. at 338, 339 n.2 (Fisher, J., dissenting) (citations omitted).

Because defendants did not raise issue to the use of the text messages under Rule 404(b), he must show that the court's admission of the evidence was "plain error clearly capable of producing an unjust result." State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)); R. 2:10-2.

In his appeal, Herbert asserted that the court's admission of the text messages that implicated defendant in a "quick grab and go" and Onyeagoro's explanation constituted plain error as a prior uncharged crime in violation of N.J.R.E. 404(b). Herbert further asserted that even if the text messages were admissible, the trial court was required to provide a limiting instruction to the jury.

The State asserted the text messages were intrinsic evidence not within the scope of Rule 404(b) because they directly prove the commission of the conspiracy to commit robbery and the eventual robbery of the gas station for which defendant was on trial. We disagree.

The admission of the text messages is exactly the type of situation where a limiting instruction is necessary to ensure that the jury does not misapply this

highly prejudicial evidence. To be sure, the text message conversation, which shows an agreement to steal from the safe at Onyeagoro's workplace, is strong evidence of a conspiracy to commit a theft at that location. Herbert and Onyeagoro discussed a quick "grab and go" theft at Onyeagoro's workplace after Onyeagoro got off work. However, neither Herbert nor Onyeagoro mentioned the use of force or use of threats to accomplish the theft, which are essential elements to a conspiracy to commit robbery. See N.J.S.A. 2C:15-1 and N.J.S.A. 2C:5-2.

More fundamentally, the text messages did not discuss plans to rob the gas station. They are extrinsic to defendants' charges. Accordingly, the trial court was required to conduct a Rule 404(b) analysis but did not do so. The court should have analyzed whether the text messages could be used to show a common plan or motive to prove a robbery, unlawful possession of a firearm, or possession of a firearm for unlawful purposes. In any event, even if admissible under Rule 404(b), the trial court would have needed to provide the jury with a limiting instruction. See Stevens, 115 N.J. at 309 (explaining that trial courts should "take pains to instruct juries carefully and comprehensively, with ample reference to the specific evidence and issues in the case, on the limited relevance of other[ bad act] evidence").

First, evidence relating to an agreement to make a quick "grab and go" did not "directly prove" the crime of robbery, which has more elements than the crime contemplated in the text messages. The text messages also did not facilitate the commission of the gas station robbery. While the jury eventually found defendant not guilty of robbery, the text message evidence may well have been used in the jury's deliberation in considering whether to convict Herbert of the lesser-included offenses "because he is a bad person in general." Cofield, 127 N.J. at 336 (quotations omitted).

In addition, the text messages did not directly prove or facilitate the commission of the crimes of unlawful possession of weapons or possession of weapons for unlawful purposes. N.J.S.A. 2C:39-4(a)(1) and N.J.S.A. 2C:39-5(b). While the trial court eventually dismissed the unlawful possession of a weapon charge, the jury found defendant guilty of possession of a weapon for an unlawful purpose. The jury may well have impermissibly used the highly prejudicial text messages as evidence that defendants were likely to commit this crime.

A Rule 404(b) violation necessitates reversal if the limiting instruction is inadequate. See Cofield, 127 N.J. at 341-42 (ordering a reversal where the limiting instruction "did not narrowly focus the jury's attention on the specific

use of other[ bad act] evidence, but instead made reference only to the generalities of [Rule 404(b)]."). But see Stevens, 115 N.J. at 309 (concluding reversal is not necessary where the trial court twice cautioned the jury against using 404(b) evidence as propensity evidence). Here, the trial court's failure to give a limiting instruction was "plain error clearly capable of producing an unjust result." Bunch, 180 N.J. at 541 (quoting Afanador, 151 N.J. at 54). Accordingly, we reverse Charles's convictions for aggravated assault by pointing a firearm, theft, and possession of a firearm for an unlawful purpose.

In addition, we also reverse Charles's conviction for conspiracy to commit robbery. The text messages were not admissible to prove the conspiracy to commit the robbery at the gas station. Combined with the possible prejudice implicated from Onyeagoro's statement about the low profits from the previous night, which was stricken but not cured, we conclude that the admission of the text messages also constituted plain error infecting the conviction for conspiracy.

On remand, Charles shall be retried following a Rule 104 hearing to determine if any of the text messages are admissible under Rule 404(b). If the remand court deems any of the text messages admissible as to the charges other

31

than conspiracy to commit robbery, an appropriate limiting instruction shall be given to the jury.

IV.

Charles next argues that the forty-two-month parole disqualifier imposed under the Graves Act on his conviction for possession of a firearm for an unlawful purpose was improper. He contends there was insufficient evidence that the BB gun that he wielded during the incident was a firearm as defined by N.J.S.A. 2C:39-1(f). Charles asserts that if the State failed to prove that the BB gun was a firearm for purposes of the unlawful possession of a weapon charge, it likewise failed to prove that element for purposes of N.J.S.A. 2C:39-4(a). He further contends that the trial court did not undertake an independent review of the evidence as required by N.J.S.A. 2C:43-6(d)(1) before imposing the parole-bar pursuant to the Graves Act. To provide guidance to the trial court on remand, we address this issue. We are unpersuaded by Charles's argument.

The Graves Act requires the imposition of a mandatory minimum parole disqualifier upon conviction for certain enumerated crimes, including possession of a firearm for an unlawful purpose under N.J.S.A. 2C:39-4(a). N.J.S.A. 2C:43-6(c). At a separate hearing,

> which may occur at the time of sentencing, the prosecutor shall establish by a preponderance of the

evidence that the weapon used or possessed was a firearm. In making its finding, the court shall take judicial notice of any evidence, testimony or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.

[N.J.S.A. 2C:43-6(d)(1).]

"All relevant material, not only that placed before the jury during the trial, may be considered." State v. Hawkins, 316 N.J. Super. 74, 80 (App. Div. 1998) (citing State v. Stewart, 96 N.J. 596, 606 (1984)).

V.

Finally, Charles argues that the seven-year NERA term he received on his conviction for second-degree conspiracy to commit robbery was excessive. Because we reverse Charles's convictions and remand for retrial, we do not reach his excessive sentencing argument.

Reversed and remanded for further proceedings and retrial consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33

A-1136-17T4